TEXACO PUERTO RICO, INC., demandante y recurrente, *v.* SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y recurrido.

*Número:* 595 *Resuelto:* 11 de abril de 1963

*James R. Beverley, R. Castro Fernández, José López Baralt* y *William Estrella,* abogados de la recurrente; *J. B. Fernández Badillo, Procurador General,* y *Arturo Estrella, Procurador General Auxiliar,* abogados del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El día 2 de julio de 1947 el Secretario de la Marina, en representación de Estados Unidos de América, cedió en arrendamiento a varias compañías petroleras, entre las cuales se encuentra la recurrente Texaco Puerto Rico, Inc., una par-

cela de terreno de cerca de 190 cuerdas, sus pertenencias y mejoras, incluyendo un muelle, conocido como el terminal o estación de Cataño, que se dedicaba al almacenaje de combustible. (¹) Se convino un término de veinte años, prorrogable por diez años adicionales, sujeto a que el contrato podía darse por terminado en cualquier momento en que el Secretario de la Marina determinara que ello era necesario para fines de la defensa nacional. (²) Las arrendatarias podían igualmente rescindirlo siempre que así lo notificaran por escrito con seis meses de anticipación, e igualmente cualquiera de ellas podía retirarse de participar previa igual notificación. El canon estipulado fue de quince mil dólares anuales.

Los derechos y obligaciones de las partes en relación con la conservación, reparación y mejoras de los bienes objeto del arrendamiento se fijaron mediante las cláusulas 5-a, 6-a, 6-c, 7-b y 7-d del contrato, que dicen así:

"5-a. Las COMPAÑIAS serán responsables de la conservación natural para la protección de las facilidades (normal protective maintenance of the facilities) . . . Por conservación natural para la protección de las facilidades se entiende el adoptar medidas similares a aquellas tomadas por compañías petroleras comerciales en relación con sus activos de capital para prevenir fuegos,

---

(¹) En la parte expositiva del contrato se expresó que las "facilidades" no habían sido reactivadas por el gobierno y requerían una inversión de alrededor de $100,000 para su rehabilitación y reacondicionamiento; que las compañías estimaron que la conservación corriente, las reparaciones y las reposiciones anuales representaban una erogación que se calculaba entre $40,000 y $50,000; y que las compañías se proponían dotar "facilidades" adicionales por valor de más de un millón de dólares.

Mediante un acuerdo de julio de 1948 las compañías se dividieron las facilidades arrendadas, correspondiéndole a la recurrente una parcela de 53.36 acres.

(²) En 29 de marzo de 1948 se sustituyó esta cláusula 3-a, y se convino que el gobierno podía dar por terminado el contrato a) en caso de incumplimiento por las arrendatarias de las condiciones y pactos contractuales; b) en caso de decretarse una emergencia nacional por el Presidente o el Congreso; y, c) en caso de que el Secretario de la Marina determinare que la defensa nacional así lo requiera, previo aviso con 120 días de anticipación.

uso y desgaste anormal o agotamiento prematuro debido a descuido o negligencia.

"6-a. Las COMPAÑIAS tendrán el derecho de reparar, renovar o reemplazar (independientemente de su obligación de la conservación natural para la protección de las facilidades) cualquier parte de las facilidades, sufragando los gastos que ello origine . . . Toda renovación o reemplazo, en todo o en parte, de cualesquiera de los activos físicos de capital de las FACILIDADES que se efectúen voluntariamente por las COMPAÑIAS serán propiedad de las COMPAÑIAS y se considerarán como mejoras y estructuras adicionales que estarán sujetas a las disposiciones de la Cláusula 7-d.

"6-c. Las COMPAÑIAS pueden erigir dentro de las FACILIDADES mejoras permanentes tales como tanques adicionales para almacenar, tuberías, almacenes, oficinas, casetas de bombas, facilidades sanitarias, desvíos de ferrocarril, y otras mejoras útiles para el mercadeo de petróleo y productos relacionados, o que faciliten la operación de las facilidades de almacenamiento y el pronto recibo, descarga y entrega de petróleo y productos relacionados, tanto al granel como en envases . . . Dichas mejoras adicionales se mantendrán libres de cargas y gravámenes de toda clase, y serán propiedad de las COMPAÑIAS y podrán ser removidas por las COMPAÑIAS en cualquier tiempo antes de la expiración o cancelación del presente contrato; Disponiéndose, sin embargo, que con anterioridad a dicha remoción las COMPAÑIAS le notificarán por escrito de su intención de removerlas y no se efectuará traslado alguno sin la manifestación escrita del GOBIERNO al efecto de que no desea adquirir título bajo la Cláusula 7-d de este contrato.

"7-b. A la expiración de este contrato o de cualquiera renovación o prórroga del mismo, o en caso de que el GOBIERNO ejercite los derechos que se le han reservado bajo la Cláusula 3-a del presente contrato, las COMPAÑIAS, a petición del GOBIERNO, removerán toda estructura y mejora y restablecerán las facilidades a la misma condición en que se encontraban a la fecha en que por vez primera ejercitaron sus obligaciones bajo la Cláusula 5-a del presente contrato, salvo el uso y desgaste normal.

"7-d. El GOBIERNO tendrá el derecho, a la expiración o terminación de este contrato, o durante un período razonable des-

pués de dicha expiración o terminación, de adquirir título sobre todas las estructuras y mejoras efectuadas por las COMPAÑIAS en las FACILIDADES y pagará a las COMPAÑIAS el valor de las mismas. El valor de tales estructuras y mejoras se determinará a base de su valor de recuperación (off-site salvage) menos el costo de restauración de las facilidades luego de efectuada la remoción. En caso de no llegarse a un acuerdo en cuanto al valor de las estructuras y mejoras, dicho valor será determinado por un tribunal de jurisdicción competente de acuerdo con las leyes que rigen la adquisición de propiedad de esa clase sobre las bases antes mencionadas."

Para evitar la filtración de combustible, durante el año 1954 la recurrente realizó ciertas obras por valor de $18,229.47 en un tanque de gasolina. Como el tanque se encontraba soterrado a seis pies de la superficie, se removió previamente la tierra que lo cubría. Al abrirse se comprobó que en el fondo tenía varias planchas perforadas las cuales no pudieron ser remendadas debido a que las mismas se encontraban en tal estado de deterioro que no resistían las soldaduras. Setenta y dos planchas fueron removidas y reemplazadas, dándole al fondo del tanque una vida útil estimada de cuatro a cinco años. La capacidad del tanque disminuyó. "Su valor nuevo fluctuaría entre $175,000 y $200,000." [3]

En su declaración de ingresos correspondiente al año 1954 la recurrente dedujo la suma mencionada de $18,229.47 como un gasto necesario y útil de su negocio. El Secretario rechazó la deducción y le notificó una deficiencia; la contribuyente pagó la deficiencia tasada y solicitó reintegro. El tribunal de instancia sostuvo la actuación administrativa y al efecto formuló la siguiente conclusión de derecho:

"Ni las mejoras, ni las reparaciones extraordinarias hechas a la propiedad que tengan el carácter de reposiciones que dismi-

---

[3] A pesar de que se practicó prueba oral en la vista del caso, la recurrente solamente designó parte de la prueba documental para completar el expediente de revisión. El recurrido no designó prueba adicional alguna para su inclusión. Por eso, en la relación de hechos sobre la naturaleza de las obras efectuadas nos hemos atenido a las determinaciones formuladas por el tribunal recurrido.

nuyan su depreciación y prolonguen su vida útil en forma apreciable, son deducibles. Sólo son deducibles las meras reparaciones que no añadan sustancialmente nada al valor de la propiedad ni prolonguen su duración y que se hagan para mantenerla en condiciones normales de operación. Esto es igualmente aplicable a la propiedad tenida en arrendamiento. 4 Mertens, *Law of Federal Income Taxation* (1954), secs. 25.41 y 25.112. Pero como ahí mismo se indica (sec. 25.41), la regla es de muy difícil aplicación en la práctica, porque no siempre puede distinguirse con facilidad entre una mejora o reposición de capital y una reparación ordinaria. Sin embargo, de alguna ayuda puede sernos el criterio cuantitativo que a veces se utiliza. De acuerdo con este criterio, por ejemplo, la reparación de una puerta hecha aisladamente se considera un gasto deducible, mientras que la misma reparación, llevada a cabo dentro de un plan de rehabilitación de la propiedad, se considera una mejora capitalizable. Id., sec. 25.41.

"Aunque se presta a duda, concluimos conforme al referido criterio cuantitativo que la reparación hecha en 1954 al tanque de gasolina fue una reparación extraordinaria que no podía deducirse como un gasto. No así la que se le hizo en 1955, la cual sólo conllevó mantener la baranda en condiciones normales de uso."

Acordamos revisar la sentencia dictada.

La recurrente insiste en que el costo de las obras realizadas en el tanque constituyen una deducción admisible para determinar su ingreso neto por tratarse de un gasto necesario y útil incurrido en su negocio ya que a) en virtud del contrato de arrendamiento venía obligada a conservarlo "en buen estado de reparación"; y, b) el gobierno arrendador se reservó la facultad de solicitar la devolución del tanque en cualquier momento y de dar por terminado el contrato en cualquier fecha, siendo por tanto el arrendamiento uno por término fijo para la corporación recurrente y sin término fijo para el gobierno.

■ En cuanto a este último particular resulta evidente de la relación de hechos que precede que la afirmación reiterada de que el contrato era por término fijo para la recurrente no corresponde con las disposiciones de las cláusu-

las 3-b y 3-c que hemos reseñado que permiten a la compañía arrendataria rescindir o retirarse del contrato mediante un aviso con anticipación de seis meses. El plazo del arrendamiento no es aparentemente el factor decisivo para determinar si la deducción como gasto ordinario es procedente. *Ehrlich* v. *Commissioner of Internal Revenue*, 198 F.2d 158 (1st Cir. 1952) ilustra lo que hemos afirmado. Tratábase de un contribuyente que ocupaba un inmueble como arrendatario por un año (1947), y una vez transcurrido dicho término, por tiempo indefinido a menos que cualquiera de las partes manifestara su intención de terminar la relación arrendaticia mediante el envío de una notificación con treinta días de anticipación. Durante el plazo original convenido (1947) el arrendatario incurrió en gastos por la suma de $7,366.34 para poner en condiciones de uso como almacén un edificio que formaba parte del inmueble arrendado. No se cursó notificación alguna sobre la terminación del contrato durante el año indicado, y el contribuyente permaneció ocupando el inmueble. La Corte de Apelaciones para el Primer Circuito rechazó la alegación del contribuyente al efecto de que como el término original había expirado y él disfrutaba de la posesión del local por la mera aquiescencia del propietario, estos gastos eran totalmente deducibles durante el año 1947 en que se incurrieron. Véase, también, *George H. Bowman Co.* v. *Commissioner of Internal Revenue*, 32 F.2d 404 (1929).

Sea ello como fuere, la cuestión fundamental que nos ocupa es si la suma de $18,229.47 constituye un gasto necesario deducible o si, en su defecto, se trata de una erogación capitalizable. La ley aplicable son las Secs. 23(a)(1)(A) y 24(a)(2) y (3) de la Ley de Contribuciones sobre Ingresos de 1954, 13 L.P.R.A. secs. 3023(a)(1)(A) y 3024(a)(2) y (3)([4]) que disponen:

---

([4])Equivalentes a las Secs. 32(a)(1) y 33 en relación con la 17(a)2 y 3 de la Ley de Contribución sobre Ingresos de 1924, 13 L.P.R.A. secs. 735, 736 y 696.

Sec. 23 (a) (1) (A):

"Al computarse el ingreso neto se admitirán como deducciones:

 (a) *Gastos:*—

 (1) *Gastos de la industria o negocio.*

 (A) *En general.*—Todos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación de cualquier industria o negocio incluyendo . . . rentas u *otros pagos*(5) *que haya que hacer como una condición para continuar usando o poseyendo, para los fines de la industria o negocio, propiedad sobre la cual el contribuyente no ha adquirido o no está adquiriendo título y en la cual él no tiene participación.*"

Sec. 24 (a) (2):

"(a) *Regla General.*—Al computarse el ingreso neto no se admitirán en caso alguno deducciones con respecto a:

(1) . . .

(2) Cualquier cantidad pagada por nuevas edificaciones o por mejoras permanentes hechas para aumentar el valor de cualquier propiedad o finca;

(3) Cualquier cantidad gastada en restaurar propiedad o en reponer el desgaste de la misma, para lo cual se hace o se ha hecho una concesión;

(4) . . ."

Y además, los Arts. 23 (a)-10 (b) y 24 (a)-2 del Reglamento, 13 R.&R.P.R. secs. 3023 (a)-10 (b) y 3024 (a)-2, que proveen como sigue:

Art. 23 (a) (10) (b):

"El costo sufragado por un arrendatario al construir un edificio o realizar mejoras permanentes en la finca de la cual él es arrendatario, se considera una inversión de capital y no

---

(5) Adviértase que en *Duffy* v. *Central R. Co.*, 268 U.S. 55, 64 (1924), se indica que la frase "otros pagos" debe ser interpretada como pagos afines con rentas, como contribuciones, seguros, intereses sobre deudas hipotecarias, y otros similares que constituyen responsabilidades del arrendador que el arrendatario ha convenido en pagar.

deducible como gasto del negocio.(⁶) Para devolver a dicho contribuyente su inversión de capital, éste puede tomar una deducción anual del ingreso bruto igual a la cantidad total del costo dividido por el número de años que restan a la duración de su arrendamiento, y tal deducción será en lugar de una deducción por depreciación. Si lo que queda del plazo del arrendamiento es mayor que la probable duración de los edificios construidos o de las mejoras realizadas, esta deducción deberá tomar la forma de una concesión por depreciación."

Art. 24 (a) (2):

"Las cantidades pagadas para aumentar el valor capital o para reponer el desgaste de una propiedad (depreciación que haya dado origen a una deducción) no son deducibles del ingreso bruto."

Mertens(⁷) expone la principal dificultad que se confronta en relación con esta cuestión en las siguientes palabras: "Constituye frecuentemente un problema insoluble de limitar la frontera que divide las erogaciones de capital y las reparaciones (ordinarias) ya que se trata de cuestiones de grado. Consiguientemente las refinadas distinciones abundan en este campo del Derecho fiscal. La línea de demarcación entre las reparaciones deducibles y las inversiones de capital es, por tanto, obscura." Intrínsecamente la importancia de la alternativa entre gasto necesario y erogación de capital estriba en que, si se considera como un gasto deducible, el importe de la contribución está inmediatamente disponible como capital corriente de operaciones, mientras que si la erogación se capitaliza, el gasto se recobra meramente mediante la depreciación del activo durante un período de años. Además, al disponerse del activo de capital la parte no depreciada de la erogación capital reduce la ganancia

---

(⁶) La Sec. 22 (b) (11) de la Ley de 1954, 13 L.P.R.A. sec. 3022 (b) (11), excluye del ingreso bruto "el ingreso, que no sea rentas, derivado por el arrendador de propiedad inmueble a la terminación del arrendamiento que represente el valor atribuible a edificaciones o a otras mejoras efectuadas por el arrendatario en dicha propiedad."

(⁷) *Law of Federal Income Taxation* (1960), vol. 4, § 25.41.

capital neta, que, como sabemos, recibe un tratamiento más favorable en la imposición del tipo contributivo que el que se aplica cuando se trata de una deducción ordinaria.

Sin embargo, puede afirmarse que la determinación sobre el particular descansa básicamente en la naturaleza, carácter y propósitos del gasto incurrido. *Deputy* v. *Du Pont*, 308 U.S. 488 (1939).([8]) Las condiciones y pactos que rigen la relación arrendaticia han sido consideradas mayormente por los tribunales como un factor a los fines de determinar el derecho del *arrendador* a reclamar una deducción por depreciación. Así, cuando el arrendatario se obliga a devolver el objeto arrendado en las mismas condiciones en que lo recibió, generalmente se le niega al arrendador la deducción por depreciación en vista de que en virtud de tal obligación contractual se le garantiza que no sufrirá pérdida alguna en relación con su inversión. *Gulf, M. & N. R. Co.* v. *Commissioner of Internal Revenue*, 83 F.2d 788 (5th Cir. 1936); *Atlantic Coast Line R. Co.* v. *Commissioner of Int. Rev.*, 81 F.2d 309 (4th Cir. 1936); *Georgia Ry. & Electric Co.* v. *Commissioner of Int. Rev.*, 77 F.2d 897 (5th Cir. 1935). Véase, sin embargo, *North Carolina Midland Railway Co.* v. *United States*, 163 F.Supp. 610 (Ct. Cl. 1958), comentado en 57 Mich. L. Rev. 1252 (1959). *A contrario sensu*, hasta el punto en que el arrendatario haya hecho una erogación de capital está autorizado *para figurar la depreciación* como gasto deducible, cuando la misma se haya efectuado en cumplimiento de sus obligaciones contractuales, *Weiss* v. *Wiener*, 279 U.S. 333 (1929); *Reisinger* v. *Commissioner of Internal*

---

([8]) En general, Graves, *Capital Expenditures v. Current Deductions*, 37 Taxes 1126 (1959); *Distinction Between Capital Expenditures and Expenses for the Conservation of Property Held for the Production of Income*, 13 Wyo. L.J. 149 (1959); *Repairs Expense Versus Capital Expenditures*, 13 Tax L. Rev. 231 (1958); *Basis Criteria for Distinguishing Revenue Charges from Capital Expenditures in Income Tax Computations*, 49 Mich. L. Rev. 213 (1950), y Nota, 47 Harv. L. Rev. 669 (1934).

Para una discusión completa de la cuestión, véase, Wriggins y Gordon, *Repairs vs. Capital Expenditures*, The Ronald Press Co. (1958).

*Revenue*, 144 F.2d 475 (2d Cir. 1944); *City Nat. Bank Bldg. Co.* v. *Helvering*, 98 F.2d 216 (1938); *Cogar* v. *Commissioner of Internal Revenue*, 44 F.2d 554 (6th Cir. 1930). Si la obligación asumida por el arrendatario es la de meramente efectuar las reparaciones ordinarias, es claro que el arrendador puede incluir la depreciación de los bienes arrendados como un gasto deducible. *Richmond Belt R. Co.*, 13 B.T.A. 1291 (1928). Existe, sin embargo, un conflicto sobre la procedencia de esta reclamación de deducción *por el propietario* cuando el arrendatario ha convenido en reparar, renovar y reemplazar los activos arrendados sin expresamente asumir la obligación de devolverlos en las mismas condiciones recibidas. *Alaska Realty Co.* v. *Commissioner of Internal Revenue*, 141 F.2d 675 (6th Cir. 1944); *Terminal Railroad Association of St. Louis*, 33 B.T.A. 906 (1936). Vemos, pues, que los términos del contrato tienen relevación cuando se trata de una deducción reclamada *por el arrendador* (y ciertamente sólo como depreciación, nunca como gasto necesario), pero no cuando, como en el presente caso, el contribuyente es el arrendatario, ya que las obligaciones contractuales que en cuanto a conservación y mantenimiento haya asumido el arrendatario tienen principalmente el efecto de reducir o eliminar las pérdidas que puede sufrir el arrendador debido a ser anticuada (*obsolescence*) o a agotamiento de la propiedad. Anotación, *Federal income tax: right of lessor or his successors to deduction for depreciation, obsolescence, or exhaustion*, 40 A.L.R.2d 440 (1955).

En términos generales, el criterio que se utiliza para resolver si se trata de una erogación de capital o un gasto ordinario se expuso desde 1926 en *Illinois Merchants Trust Co., Executor*, 4 B.T.A. 103, en la siguiente forma:

"El costo de reparaciones incidentales que ni aumentan notablemente el valor de la propiedad ni prolongan su utilidad en forma apreciable y que meramente la conservan en condiciones de operación eficiente, puede deducirse como gasto . . . Hasta

el grado en que detienen el deterioro y prolongan la vida útil de la propiedad en forma apreciable, las reparaciones que participan de la naturaleza de reposiciones, deben cargarse contra la reserva de depreciación."

Como podrá observarse, el factor más importante es la prolongación de la utilidad de la propiedad. Aunque cada caso debe examinarse aisladamente a base de sus circunstancias específicas, generalmente se acepta que esta prolongación es apreciable cuando la utilidad se extiende por un término mayor de un año. *Hotel Kingkade* v. *Commissioner of Internal Rev.*, 180 F.2d 310 (10th Cir. 1950). Otro factor a considerar es el aumento en valor de la propiedad. *Fidelity Storage Corporation* v. *Burnet*, 58 F.2d 526 (1932); Shugarmen, *Basic Criteria for Distinguishing Revenue Charges from Capital Expenditures in Income Tax Computations*, 49 Mich. L. Rev. 213 (1950).

La parte recurrente descansa con marcado énfasis en *Journal Tribune Publ. Co.* v. *Commissioner*, 216 F.2d 138 (8th Cir. 1954), para sostener que como contractualmente estaba obligada a conservar el tanque "en buen estado de reparación," el gasto incurrido es, sin más, deducible, irrespectivamente de su naturaleza, carácter y propósitos. En efecto, en dicho caso se resuelve que cuando el contrato requiere al arrendatario conservar la propiedad arrendada, el costo de maquinaria y equipo adquirido por éste para reponer unidades obsoletas y ya descartadas que formaban parte del objeto arrendado, es deducible como un gasto ordinario aun cuando el equipo y la maquinaria tuvieran una vida útil mayor de un año. Aunque los hechos envueltos en este caso fueran iguales a los de la situación que consideramos, que no lo son, no nos persuade el criterio que en el mismo se expresa porque ignora los principios básicos que hemos expuesto—el carácter deducible depende de la naturaleza y propósitos del gasto incurrido y las condiciones contractuales sólo tienen significación a los fines de determinar

la procedencia de una reclamación de deducción por depreciación del arrendador—y prácticas establecidas de la ciencia de la contabilidad.(9) Además, reducida a su última expresión la regla expuesta en *Journal-Tribune* permitiría la deducción de cualquier gasto hecho por el arrendatario, no importa su cuantía o naturaleza, siempre que se hubiera efectuado en cumplimiento de obligaciones contractuales. Esto desnaturalizaría completamente el propósito de la ley al permitir las deducciones, que no es otro que el de que el ingreso corriente tenga una relación estrecha e íntima con los gastos corrientes en que se ha incurrido para obtenerlo.

 Según anticipamos en el párrafo anterior, la situación de hechos del caso de *Journal-Tribune* puede distinguirse sin gran esfuerzo de la de este pleito, pues allí, no sólo la parte arrendataria dentro de su obligación contractual de conservación estaba autorizada a disponer por venta o en cualquier otra forma del equipo y maquinaria incluido en el objeto del arrendamiento, si que también se comprometía a sustituirlo por unidades nuevas o adicionales, que ipso facto pasaban a formar parte de la propiedad cedida en arrendamiento, sin que la arrendataria tuviera derecho a compensación de clase alguna. No es ésa la relación contractual que existe entre la recurrente y el gobierno arrendador. De las cláusulas transcritas al comienzo de esta opinión surge palmariamente que con excepción de la "conservación natural para la protección de las facilidades" para prevenir fuegos y uso o desgaste extraordinario y agotamiento prematuro

---

(9) Los otros casos citados por la recurrente—*Illinois Central R. Co.* v. *Commissioner of Internal Revenue*, 90 F.2d 458 (7th Cir. 1937) y *Atlantic Coast Line R. Co.* v. *Commissioner of Internal Rev.*, 81 F.2d 309 (4th Cir. 1936)—envuelven un sistema particular de contabilidad autorizado a las empresas de ferrocarriles para el retiro y sustitución de unidades rodantes, que no es de estricta aplicación a los hechos que consideramos. Además, no podemos ignorar que responden a una política definida para fomentar el desarrollo rápido de un eficiente sistema nacional de comunicaciones. Dentro del marco puertorriqueño las empresas petroleras no necesitan de protección especial, ni ella se justifica.

debido a descuido o negligencia—ninguna de estas situaciones está presente en este pleito, por lo menos según se deduce de las determinaciones de hecho del tribunal a quo—cuando se trata de renovar o reemplazar las facilidades, la arrendataria conserva el título de las mismas, sujeto al derecho del gobierno a adquirirlas previo el pago correspondiente, según se establece en la cláusula 7-b. Conservándose por la recurrente la propiedad de estos activos, ¿cómo puede pretenderse que si prolongan su utilidad y aumentan su valor no se consideren como erogaciones de capital sujetas a depreciación anual o a una deducción por agotamiento?

■ Esto nos trae al punto final del asunto. De los escasos elementos de prueba de que disponemos podemos colegir que la "reparación" efectuada tuvo dos consecuencias: 1) extendió de cuatro a cinco años la vida útil del tanque; y, 2) su valor "nuevo" fluctúa entre $175 mil y $200 mil. En ausencia de evidencia específica sobre el valor y estimado de vida útil del tanque antes y después de la reparación, y consideradas las determinaciones de hecho y la conclusión final del tribunal de instancia, podemos inferir que ambos aumentaron. Siendo ello así, sólo cabe sostener que el gasto de $18,229.47 constituyó una erogación de capital, y no un gasto ordinario deducible totalmente en el año en que se incurrió. No cometió error el tribunal recurrido al sostener que dicha partida no es deducible como un gasto ordinario y necesario del negocio de la recurrida. Ahora bien, procede conceder a la recurrente para este año contributivo una deducción bajo el Art. 23(a)(10)(b) del Reglamento, *supra*, a los fines de devolverle su inversión de capital. Esta deducción es igual a la cantidad total invertida dividida por el término restante del arrendamiento. En cuanto se refiere al año contributivo 1954, la deducción debe tomarse en la proporción que corresponda desde la fecha en que se incurrió en el gasto. Como no tenemos prueba sobre este hecho devolveremos el

caso al tribunal de instancia para la determinación apropiada, para lo cual podrá recibir la prueba que sea pertinente.

*Se dictará sentencia de conformidad.*